UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

ISRAEL VASQUEZ,

Plaintiff,

-against-

CITY OF NEW YORK; MICHAEL DONNELLY
(Tax ID # 883801), THOMAS AIELLO
(Tax ID # 868427), ANNABELLE NIEVES
(Tax ID # 876782), Individually and as Members
of the New York City Police Department (NYPD),

Defendants.
------------------------------------------------------------ X



**AMENDED COMPLAINT**

Index No. 10-cv-6277 (LDS)

**JURY TRIAL**
**DEMANDED**

Plaintiff ISRAEL VASQUEZ ("Plaintiff"), by his attorneys ROMANO & KUAN, PLLC

and EMERY CELLI BRINCKERHOFF & ABADY LLP, complaining of the Defendants,

respectfully alleges, upon information and belief as follows:

<b><u>NATURE OF ACTION</u></b>

1.     This is a civil action, pursuant to 42 U.S.C. §1983, 1985 and 1988, and *Brady v.*

*Maryland,* 373 U.S. 83 (1963) ("Brady") seeking monetary damages for Plaintiff's malicious

criminal prosecution, wrongful conviction, and imprisonment due to the violation of his

fundamental federal constitutional rights to due process and to be free of unreasonable search

and seizure pursuant to the Fourteenth and Fourth Amendments to the United States

Constitution.

2.     Detectives and police officers of the New York City Police Department

(hereinafter "NYPD") instigated and continued the prosecution of Plaintiff without probable

cause to believe Plaintiff to be guilty of the crimes charged, manufactured evidence through

highly-suggestive, unfair, and unreliable investigative procedures which tainted the witnesses

1

recollection and encouraged perjured testimony, and failed to identify, document, and inform the Bronx District Attorney's Office of exculpatory evidence, all of which led to the wrongful and unjust prosecution of Plaintiff.

3.      NYPD detectives and police officers caused Plaintiff's unconstitutional conviction and subsequent imprisonment by deliberately suppressing exculpatory evidence, known as "*Brady* material," and also by lying to and misleading prosecutors.  The suppressed evidence included a videotape that contradicted and discredited the testimony of a key witness against Plaintiff at trial.

4.      Defendant City is liable pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) (*"Monell"*).  Such unconstitutional conduct by the NYPD was tolerated or encouraged by the deliberate or de facto policies, practices or customs of this City agency.  The policies, practices and/or customs of the NYPD included a deliberate indifference to properly train, supervise, or discipline their employees who engaged in the above constitutional violations.

5.      As a result of the aforementioned police misconduct, Plaintiff served more than twelve (12) years in prison for crimes he did not commit.

## STATEMENT OF JURISDICTION

6.      At all times herein mentioned, Plaintiff was a resident of the County of the Bronx, City and State of New York.

7.      Defendant CITY OF NEW YORK ("Defendant CITY") is a municipal corporation existing by virtue of the laws of the State of New York.

8.      The NYPD is an agency of the Defendant CITY, and all police officers and detectives referred herein were, at all times relevant to this complaint, its employees and agents.

9.      Defendant MICHAEL DONNELLY ("Defendant DONNELLY"), Tax I.D. No. 883801, was at all relevant times a detective employed by the New York City Police Department.  He is named here in his official and individual capacities.

10.     Defendant THOMAS AIELLO ("Defendant AIELLO"), Tax I.D. No. 868427, was at all relevant times a detective employed by the New York City Police Department.  He is named here in his official and individual capacities.

11.     Defendant ANNABELLE NIEVES ("Defendant NIEVES"), Tax I.D. No. 876782, was at all relevant times a detective employed by the New York City Police Department.  She is named here in her official and individual capacities.

12.     At all times relevant to this Complaint, the aforementioned Defendants acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

13.     Defendants DONNELLY, AIELLO, AND NIEVES are collectively referred to as the "Individual Police Officer Defendants."

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Procedural History of Underlying Criminal Case

14.     The underlying criminal case involved an execution-style murder of a Bronx woman, Denise Raymond, that occurred on the evening of January 17, 1995.  According to the prosecution, Ms. Raymond's murder was orchestrated by Charles McKinnon, a former boyfriend of the victim, who was charged with her murder and acquitted after a separate trial.  Plaintiff and three co-defendants – Michael Cosme, Devon Ayers and Carlos Perez – were charged with having carried out Ms. Raymond's murder at McKinnon's behest, and tried together, prior to the McKinnon trial.

15.     Two days after Ms. Raymond's death, a livery cab driver, Baithe Diop, was killed on January 19, 1995.  Although there was no evidence to link the two crimes, Defendants falsely and maliciously conspired to present false evidence that both of these crimes were committed by the same individuals.

16.     Plaintiff was arrested on February 10, 1995 for the murder of Baithe Diop.  After Defendants conspired to create false evidence that Ms. Raymond's murder and Mr. Diop's murder were committed by the same individuals, Plaintiff was indicted for both murders on March 14, 1995 (Bronx Indictment No. 1086/95).

17.     Following a jury trial conducted by Assistant District Attorney Daniel McCarthy, a verdict was entered on February 26, 1996 by the Supreme Court, Bronx County, convicting Plaintiff of two counts of murder in the second degree for the murder of Ms. Raymond.  He was acquitted of all charges involving the murder of Mr. Diop.

18.     On May 8, 1997, Plaintiff was sentenced to two concurrent prison terms of twenty-five years to life.

19.     Plaintiff appealed his conviction.  By order dated August 23, 2007, the Appellate Division, First Department, unanimously reversed, vacated the conviction, and dismissed the indictment in its entirety.  In its decision, the Appellate Division held that the evidence against Plaintiff was legally insufficient and criticized the prosecution's case as one "based on speculation unsupported by any credible evidence." *See People v. Vasquez*, 43 A.D.3d 348 (1st Dep't 2007).

20.     Plaintiff was released from prison on August 27, 2007.

21.     Plaintiff spent more than twelve and a half years in prison.

**The Police Investigation**

22.     Denise Raymond came home to her apartment, in the Soundview area of the Bronx, after work on the evening of January 17, 1995.  Based on the crime scene investigation, it appeared that Ms. Raymond was accosted as she entered her apartment, after which she was dragged to her bedroom, handcuffed, blindfolded, and gagged, and then shot twice in the head, through two pillows that were placed over her.

23.     Following the shooting, Defendants DONNELLY, AIELLO, and NIEVES, detectives employed by the NYPD, investigated Ms. Raymond's homicide.

24.     Ms. Raymond's murder received considerable media attention and was widely reported in the local newspapers, radio, and television news.

25.     During the investigation, the Defendants repeatedly questioned a teenager named Cathy Gomez and a neighborhood drug addict, Miriam Tavares, who spoke only Spanish, about their knowledge of the Raymond murder.

26.     Prior to questioning Cathy Gomez, Defendants also questioned Ms. Gomez's younger brother at the 43rd Precinct.

27.     On February 3, 1996, the police arrested Michael Cosme based on information provided by Ms. Gomez and Ms. Tavares.

28.     That same day, Plaintiff, who grew up with Mr. Cosme and considered him family, arrived at the police precinct to inquire why Mr. Cosme had been arrested and to deliver cookies, cigarettes, and soda to him.

29.     The police interrogated Plaintiff at the precinct and released him.

30.     Despite knowing that Cathy Gomez and Miriam Tavares had unreliable information and provided inconsistent accounts, the Defendants relied on the information

provided by these two witnesses to pursue Plaintiff as a suspect.

31.     By using a variety of unconstitutional practices, including but not limited to questioning the witnesses together, using Cathy Gomez as a translator for Miriam Tavares, feeding details about the crime scene and police investigation that were unknown to the witnesses, threatening to unjustifiably jail Ms. Gomez's parents who were on probation and parole, interrogating Ms. Gomez's fifteen-year-old brother and threatening to prosecute him, and giving both witnesses, who were indigent, financial incentives to provide false incriminating evidence, the Defendants manufactured testimony against Plaintiff that they knew or should have known was false.

32.     After the Defendants used these highly suggestive, coercive, and unconstitutional tactics while questioning the witnesses, Cathy Gomez falsely claimed that, the day after Ms. Raymond's death, she was in a park with a lot of people and allegedly overheard several individuals make statements about the Raymond homicide.

33.     After Defendants told her that a juice container and mustard jar was found in Ms. Raymond's sink and an empty deli wrapper in her refrigerator at the crime scene, which the police theorized the murderers had left, Ms. Gomez eventually claimed that Plaintiff made a statement in the park about drinking juice and having a sandwich.

34.     On the basis of Cathy Gomez's inconsistent testimony, the police concluded that Plaintiff was present in Ms. Raymond's apartment at the time of her murder and that Plaintiff was an accomplice.

35.     The police did not have probable cause to arrest and prosecute Plaintiff on the paucity of this evidence.  Nevertheless, on March 14, 1995, Defendants indicted Plaintiff for Denise Raymond's murder, after having arrested him solely for the homicide of Baithe Diop.

36.     Defendants' arrest and prosecution of Plaintiff for the homicide of Baithe Diop was equally baseless.  The case against Plaintiff was based solely on the testimony of Miriam Tavares, who claimed to have witnessed the Diop shooting from a small opening in the bathroom window of her apartment, which was some distance away from the scene of the crime.

37.     Defendants never went to the apartment to see whether it was even possible for Ms. Tavares to observe what she claimed to have seen from her apartment building, particularly on a dark and rainy night.

38.     Defendants arrested and prosecuted Plaintiff for the Diop murder solely on the basis of Ms. Tavares's testimony, even though her testimony was uncorroborated and her first statement to the police made no mention of Plaintiff.

39.     After meeting repeatedly with Defendants, Ms. Tavares eventually stated that she thought she saw Plaintiff at the crime scene.  During Plaintiff's trial, Ms. Tavares testified that she thought she saw Plaintiff from behind at the scene of the Diop murder, but was unsure whether it was him.

40.     Defendants prosecuted Plaintiff for the Diop homicide even though Ms. Tavares, the only witness against him, changed her testimony multiple times.

41.     The Defendants knew or should have known that they did not have probable cause to arrest and prosecute Plaintiff for either homicide because they deliberately used constitutionally impermissible practices to manufacture false evidence against him.

42.     The Defendants knowingly coached Ms. Gomez, the only witness against Plaintiff for the Raymond homicide, to give such false testimony against Plaintiff which led to his wrongful and unjust prosecution and conviction.

43.     Additionally, the Defendants knew they did not have probable cause to arrest and

prosecute Plaintiff, since a mere two weeks after the murder, before Plaintiff was even arrested, Ms. Gomez told Defendant DONNELLY that she did not know anything about the Raymond murder.

44.     As further proof that the evidence against Plaintiff was manufactured by the Defendants, Ms. Gomez could not provide a consistent account of the alleged events in the park. During the Grand Jury proceeding, Ms. Gomez testified that Devon Ayers, not Plaintiff, made the statement about the juice and sandwich.  At trial, Ms. Gomez testified that she did not recall who was in the park that day, if Plaintiff made the statement about the juice and sandwich, or if such a statement was ever even made.

45.     There was no other physical, circumstantial or testimonial evidence linking Plaintiff to Ms. Raymond or the scene of the crime.

46.     There was no other physical, circumstantial or testimonial evidence linking Plaintiff to Mr. Diop or the scene of the crime, much less any evidence that Plaintiff played a role in both crimes.

47.     The Defendants procured an indictment against Plaintiff in bad faith and conspired to charge him with falsely committing two unrelated murders in bad faith.

48.     On information and belief, Defendants suppressed key pieces of evidence that would exonerate Plaintiff and deliberately ignored investigative leads that would have exonerated Plaintiff.  For instance, Defendants never questioned or otherwise investigated an individual who pawned a bracelet with the word "Denise" and Ms. Raymond's birthday engraved on it shortly after Ms. Raymond's murder.  Defendants also failed to pursue an individual who confessed to the Diop homicide, and provided details of how the crime was committed.

49.     Plaintiff is innocent and has maintained his innocence from the inception of the criminal prosecution against him.

**Withholding of Brady Material**

50.     To support the charges against Plaintiff, the prosecution's strategy was to establish a link between Mr. McKinnon and Ms. Raymond – who knew each other and who had been romantically involved a number of years before the murder -- and to argue that Plaintiff and his co-defendants, Michael Cosme, Devon Ayers and Carlos Perez, carried out the murder at McKinnon's behest.

51.     The prosecution pursued this strategy because there was no evidence to connect Plaintiff and his co-defendants to Ms. Raymond.  Plaintiff was a seventeen-year old who lived at home with his parents at the time of the murder, while Ms. Raymond was a thirty-eight year old Federal Express executive.  There was no evidence to connect Plaintiff and his co-defendants – all teenagers and young men – with Ms. Raymond, who moved in entirely different social circles.

52.     To support this strategy, Defendants argued that McKinnon stalked and harassed Denise Raymond immediately prior to her death, and that he orchestrated the murder with what Defendant AIELLO described as a group of "younger boys."

53.     Defendants relied on Kim Alexander, a co-worker of Ms. Raymond's, who testified before the Grand Jury, at Plaintiff's trial, and at the trial of Charles McKinnon, to support their theory that McKinnon orchestrated Ms. Raymond's death.

54.     According to Ms. Alexander, she and Ms. Raymond left work together on the evening Ms. Raymond was killed.  She testified that as they waited on an upper floor of the Federal Express building for the elevator, a man, whom Ms. Raymond apparently knew, but who

was a stranger to Ms. Alexander, suddenly appeared. Ms. Alexander testified that she remained with Ms. Raymond and the man as they waited for the elevator. The three then rode the elevator down to the lobby together, and exited the building at the same time.

55.    Ms. Alexander testified that Ms. Raymond appeared upset and agitated with the man throughout the entire encounter, and told him to leave her alone.

56.    Ms. Alexander testified that the man followed Ms. Raymond as she walked away from their office building, and that after this encounter, she never saw Ms. Raymond alive again.

57.    Ms. Alexander described the man in the elevator as a tall dark skinned man in his mid-thirties to early forties, wearing a trench coat.

58.    Using highly suggestive identification methods, Defendant AIELLO showed Ms. Alexander photos of Charles McKinnon in a trench coat and video footage of McKinnon and his family, after Ms. Alexander informed Defendant AIELLO that she could not make a positive identification of McKinnon from pictures he had previously shown her.

59.    Rather than conducting a line-up identification procedure, Defendant AIELLO manufactured a false positive identification of McKinnon by showing Ms. Alexander lengthy video footage of McKinnon with his family. On information and belief, in that video footage, McKinnon was the only individual whose age and build matched that of the individual described by Ms. Alexander. After Ms. Alexander picked McKinnon out of the video, Defendant AIELLO then improperly informed her that she had identified the suspect, Charles McKinnon.

60.    Unsurprisingly, after being told that she had identified McKinnon and after being shown photos of him in a trench coat and video footage of him and his family, Ms. Alexander subsequently picked Mr. McKinnon out of a line-up.

61.    Ms. Alexander presented powerful evidence to the Grand Jury and at Plaintiff's

trial to establish that McKinnon "set up" Ms. Raymond to be killed by Plaintiff and the other three defendants that night.

62.     At Plaintiff's trial, Ms. Alexander's testimony was the sole evidence presented regarding Mr. McKinnon's alleged contact with Ms. Raymond on the night of the murder.

63.     This alleged meeting between Ms. Raymond and Mr. McKinnon was also the sole overt act alleged in the indictment to have been committed by McKinnon to support a charge of conspiracy between McKinnon, Plaintiff, and the other three defendants.

64.     The prosecutor relied heavily on Ms. Alexander's testimony, and argued in summation that Plaintiff committed the Raymond murder after McKinnon acted as "the set up guy" for that murder.  He then drew parallels between Plaintiff and Mr. McKinnon, arguing that Plaintiff entered Ms. Raymond's apartment building undetected, just as Mr. McKinnon entered an upper floor of the Federal Express building undetected.

65.     However, the basis for this conspiracy theory was completely false.  Mr. McKinnon never had an encounter with Ms. Raymond and Ms. Alexander on the night Ms. Raymond was murdered.

66.     Indeed, security tapes from the Federal Express building showed that Ms. Alexander and Ms. Raymond left the elevator together, alone, that night.  Mr. McKinnon appeared nowhere on the tape.

67.     Defendants knew that their conspiracy theory was false because, shortly after Ms. Raymond's murder, Defendant AIELLO viewed the security tapes at the Federal Express building with Ms. Alexander, took possession of the tapes, and therefore knew that Ms. Raymond did not encounter Mr. McKinnon on the night of her murder, as Ms. Alexander claimed.

68.     Knowing that this evidence completely undermined their conspiracy theory against Charles McKinnon, Plaintiff, and the other three criminal defendants, Defendants deliberately suppressed the security tapes by failing to "voucher" them in violation of NYPD policy and procedure and falsely informing the prosecutor, ADA Daniel McCarthy, that they had not taken the tapes into evidence.

69.     Defendant AIELLO also completed a Police Department report falsely claiming that Ms. Raymond did not appear on the security tape.   As a result, Plaintiff, the Grand Jury, and the trial jury never knew that there existed objective evidence contradicting the prosecution's theory that Charles McKinnon orchestrated and set up Ms. Raymond to be murdered by Plaintiff, and the other three defendants.

70.     These tapes constitute *Brady* material because they undermined the prosecution's theory that Charles McKinnon orchestrated and enlisted Plaintiff, Cosme, Ayers, and Perez to commit Ms. Raymond's murder.  Thus, this evidence should have been disclosed to Plaintiff, but was never disclosed to him at any point, including while he was appealing his wrongful conviction.

71.     More than one year after Plaintiff's conviction, Ms. Alexander testified at McKinnon's trial and presented the same testimony as in Plaintiff's trial.

72.     At the close of evidence in the McKinnon trial, and in response to the Court's inquiry, the prosecutor (based on AIELLO's false information) represented to the Court that Defendant AIELLO had met with Ms. Alexander to view a surveillance tape at the Federal Express building, but did not take the tape into police custody because Defendant AIELLO saw no one – Ms. Raymond, Ms. Alexander, or Mr. McKinnon – on the tape.

73.     The Court ordered the prosecutor to once again "specifically ask" Defendants

DONNELLY and AIELLO whether they had taken the tape into police custody, and whether Ms. Raymond did, in fact, appear on it.

74.     At the same time, the Court gave permission for McKinnon's defense attorney to call an additional witness, a Federal Express security guard. McKinnon's defense attorney stated that this guard would testify that he viewed the surveillance tape with Defendant AIELLO and Ms. Alexander; that the tape had, in fact, been taken into police custody by Defendant AIELLO; and that it showed Ms. Alexander and Ms. Raymond in the elevator alone.

75.     Only then did Defendant AIELLO admit to the prosecutor that he had, in fact, taken possession of the tape and turned it over to the prosecutor.   The prosecutor then disclosed the tape to McKinnon's counsel.

76.     After the tapes were disclosed for the first time at the close of Mr. McKinnon's trial, the Court held that the tapes were *Brady* material, and that it was a "serious" violation to fail to produce this evidence, and grounds for a mistrial.

77.     During the McKinnon trial, the parties stipulated that Defendant AIELLO had concealed evidence from the Bronx District Attorney's Office, which resulted in the prosecutor's failure to disclose this *Brady* material.   The stipulation, in effect, stated that Defendant AIELLO lied by telling the prosecutor that he had viewed the tape but did not seize it, and by telling the prosecutor that he "did not see the deceased, Kim Alexander or [McKinnon]" in the tape, when in fact, the tape showed only Ms. Alexander and Ms. Raymond leaving the elevator together.

78.     The jury, having heard the exculpatory evidence at Mr. McKinnon's trial – as well as the fact that the lead detective in the Raymond investigation, Defendant AIELLO, had concealed evidence from the prosecutor – acquitted McKinnon of all charges.

79.     However, the exculpatory evidence was never produced at Plaintiff's trial, or at

any point during Plaintiff's appeal of his conviction, even though Ms. Alexander presented substantively identical testimony at Plaintiff's trial and before the Grand Jury as she had at McKinnon's trial.

80.     During Plaintiff's trial, the jury was never informed that McKinnon did not, in fact, illicitly enter Ms. Raymond's workplace the night of her murder, argue with her, and then follow her home.  They were left with uncontradicted evidence supporting the prosecution's theory that McKinnon had a strong motive for the murder, and that he then conspired with Plaintiff to carry out the murder.

81.     Had the *Brady* material been presented to the Grand Jury or during Plaintiff's trial, as it should have been, it is highly unlikely that he would have been prosecuted or convicted, and remained wrongfully incarcerated for more than twelve and a half years, because once Kim Alexander's testimony had been discredited, there was not a shred of evidence to establish that Plaintiff had a motive for Ms. Raymond's murder, much less to connect Plaintiff to Ms. Raymond in any way.

### Plaintiff's Injuries and Damages

82.     As a direct and proximate consequence of the aforementioned actions by the Defendants, Plaintiff:

       (1)     Suffered more than twelve and a half years of imprisonment;

       (2)     Suffered severe emotional and mental anguish and pain;

       (3)     Was denied his federal constitutional rights and liberties;

       (4)     Was denied the opportunity to pursue normal relationships with and to enjoy the companionship of family members and friends;

       (5)     Was publicly shamed, disgraced, ridiculed and humiliated and suffered

damage to reputation;

(6)     Incurred substantial legal fees:

(7)     Was denied years of gainful employment and income;

(8)     Suffered permanent impairment of earning power;

(9)     Continues to suffer emotional and mental anguish and pain; and

(10)    Incurred other items of attendant damages.

### FIRST CAUSE OF ACTION

**(42 U.S.C. §1983; Malicious Prosecution; Individual Police Officer Defendants)**

83.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

84.     By virtue of the foregoing, the aforementioned police officers and detectives initiated, or caused the initiation, of criminal proceedings against Plaintiff.

85.     Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspire to manufacture, testimony which they intended to use against Plaintiff in criminal proceedings, and/or which they caused to be used as a basis for Plaintiff's prosecution and conviction.

86.     The aforementioned Defendants did so knowing that the testimony was false or were highly likely to be false, and/or with deliberate indifference to whether they were true or false, through the use of constitutionally impermissible, coercive, highly-suggestive and unreliable interrogation procedures.

87.     Without the false or utterly unreliable testimony which Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to prosecute and convict Plaintiff for the murder of Denise Raymond.

88.     Additionally, prior to Plaintiff's conviction in 1997, and continuing thereafter, the Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of the "*Brady* material."

89.     The Defendants knew they had duties, under the United States Constitution as well as the laws and regulations of the State and the City of New York, (a) to disclose the *Brady* material to the Bronx District Attorney's Office so that the latter could disclose it to the defense and would not be caused to bring about the conviction of Plaintiff based upon false, misleading, or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of the *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

90.     Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed the *Brady* material from, lied about, and otherwise failed to disclose the *Brady* material to Plaintiff.

91.     The police officers and detectives acted with actual malice.

92.     There was no probable cause for the commencement or the continuation of the criminal proceeding.

93.     The prosecution terminated in Plaintiff's favor.

94.     The acts and conduct of the defendants constitute malicious prosecution in violation of the Fourth Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION

### (42 U.S.C. §1983; Denial of Due Process and a Fair Trial

### Against Individual Police Officer Defendants)

95.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

96.     Defendants, individually and collectively, manufactured, acted in concert to manufacture, aided and abetted each other to manufacture, and/or conspire to manufacture, testimony which they intended to use against Plaintiff in criminal proceedings, and/or which they caused to be used as a basis for Plaintiff's prosecution and conviction.

97.     The aforementioned Defendants did so knowing that the testimony was false or were highly likely to be false, and/or with deliberate indifference to whether they were true or false, through the use of constitutionally impermissible, highly-suggestive and unreliable interrogation procedures.

98.     Without the false or utterly unreliable testimony which Defendants wrongfully manufactured or knew had been wrongfully manufactured, there would have been no basis to convict Plaintiff for the murder of Denise Raymond.

99.     Additionally, prior to Plaintiff's conviction in 1997, and continuing thereafter, the Defendants, acting individually and in concert and conspiracy with one another, covered up, lied to prosecutors about, and withheld knowledge from Plaintiff of the "*Brady* material."

100.    The Defendants knew they had duties, under the United States Constitution as well as the laws and regulations of the State and the City of New York, (a) to disclose the *Brady* material to the Bronx District Attorney's Office so that the latter could disclose it to the defense and would not be caused to bring about the conviction of Plaintiff based upon false, misleading,

or incomplete evidence and argument, and/or (b) to make truthful statements to the prosecution concerning the existence of the *Brady* material and not to cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

101.    Notwithstanding their awareness of their duties, the Individual Defendants, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed the *Brady* material from, lied about, and otherwise failed to disclose the *Brady* material to Plaintiff.

102.    They did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of the circumstances surrounding Ms. Raymond's death, and of the reliability and the thoroughness, honesty, and professionalism of the police investigation, and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's federal constitutional rights.

103.    The aforesaid conduct of Defendants operated to deprive Plaintiff of his right to due process and a fair trial under the Fourteenth Amendment of the United States Constitution.

## THIRD CAUSE OF ACTION

### (<u>Monell</u>/ 42 U.S.C. § 1983 Claim Against Defendant City of New York)

104.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

105.    Prior to Plaintiff's arrest, policymaking officials at the NYPD, including but not limited to the New York City Police Commissioner, with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity, implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and/or discipline concerning the constitutional duty of police investigators to make

timely disclosure to the District Attorney and/or the defense of *Brady* material, to provide truthful information to prosecutors about their knowledge of criminal investigations they have conducted, and to testify truthfully, accurately, and completely during criminal proceedings concerning such investigations.

106.   The above-mentioned *Brady* material included, but was not limited to, evidence of innocence, evidence that an identifying witness was unreliable, and evidence impeaching the credibility of significant prosecution witnesses.

107.   The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were further directly, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are arrested or prosecuted based upon investigations conducted by members of the NYPD, namely:

a)   the institution and implementation of grossly negligent, reckless and/or deliberately inadequate or unlawful policies, procedures, regulations, practices, and/or customs concerning tactics used in interrogating and questioning witnesses resulting in false, unreliable, and manufactured evidence; and

b)   deliberate indifference by policymaking officials at the NYPD with respect to their obligation to properly instruct, train, supervise and discipline their employees, including the individual defendants in this case, with respect to such matters, in order to deter and to prevent such constitutional violations from occurring.

108.   The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York and the NYPD, who knew (or should have known):

(a)   to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of

criminal cases;

(b)     that such issues either present employees with difficult choices of the sort that
        instruction, training and/or supervision will make less difficult or that the need for
        further instruction, training, supervision and/or discipline was demonstrated by a
        history of employees mishandling such situations; and

(c)     that the wrong choice by municipal employees concerning such issues will
        frequently cause the deprivation of the constitutional rights of a criminal suspect
        or accused and cause him constitutional injury.

109.     The aforementioned policymaking officials had the knowledge alleged in the

preceding paragraph based upon, among other reasons, (A) numerous judicial decisions, (B)

numerous civil lawsuits, alleging that police have manufactured, falsified, exaggerated or

withheld evidence, thereby causing unlawful injuries to individuals suspected of crime, and (C)

reports by, among others, New York City Comptrollers Elizabeth Holtzman and Alan Hevesi,

finding that the NYPD did little or nothing to investigate, discipline or retrain officers alleged in

civil lawsuits to have engaged in such wrongful behavior.

110.     Despite being put on notice by the foregoing that significant numbers of police

officers and detectives do not understand or comply with the aforementioned constitutional

requirements, policymaking officials for the City of New York have inexcusably failed to

discipline and/or re-train such officers, thereby demonstrating deliberate indifference to the

constitutional requirements being infringed.

111.     Under the principles of municipal liability for federal civil rights violations,

policymaking officials for the Defendant City of New York and the NYPD, have final

responsibility for training, instructing, supervising, and disciplining police personnel with respect

to the investigation and prosecution of criminal matters, including proper practices to be used in

interrogating and questioning witnesses to avoid false, unreliable, tainted, and manufactured

evidence against criminal defendants.

112. The policymaking officials for the Defendant City of New York and the NYPD, at all relevant times, had final authority, and constitute City policymakers for whom the City is liable, with respect to compliance by employees of the NYPD with the above-mentioned constitutional requirements.

113. During all times relevant to this Complaint, the policymaking officials for the Defendant City of New York and the NYPD owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs and practices sufficient to deter and to avoid conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

114. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution of the United States.

115. By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

**JURY DEMAND**

116. Plaintiff hereby demands trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1. Compensatory damages in an amount to be determined;

2.      Punitive damages against the Individual Police Officer Defendants in an amount

to be determined;

3.      For pre-judgment interest as allowed by law;

4.      An order awarding Plaintiff reasonable attorneys' fees, together with the costs and

disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court; and

5.      Such other further relief as the Court may deem just and proper.

Dated: August 17, 2012
        New York, New York

ROMANO & KUAN, PLLC

By: _Julia Kuan /ES_____
        Julia P. Kuan

100 Lafayette Street, Suite 401
New York, New York 10013
(212) 274-0777

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: _Eisha Jain_____
        Earl S. Ward
        Eisha Jain
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

*Attorneys for Plaintiff*