UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                 :

JESSENIA VAZQUEZ,                      :
     *as administrator of the Estate of Israel Vasquez,*   :
                                   :

                   Plaintiff,       :          10-CV-6277 (JMF)
                                   :
             -v-                :        OPINION AND ORDER
                                   :

CITY OF NEW YORK et al.,           :
                                   :
                   Defendants.     :
                                   :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  09/05/2014

**JESSE M. FURMAN, United States District Judge:**

     Jessenia Vazquez, as administrator of the estate of her late husband Israel Vasquez ("Plaintiff"), brings this action, pursuant to Title 42, United States Code, Section 1983, against former New York City Police Department ("NYPD") Detectives Michael Donnelly and Thomas Aiello (together, "Defendants"). Plaintiff seeks damages arising from his 1996 murder conviction in New York state court, which the Appellate Division reversed in 2007 — after he had spent more than twelve years in prison — based on insufficiency of the evidence. Pending before the Court are three motions. Defendants move, pursuant to Rule 702 of the Federal Rules of Evidence, to exclude the testimony of Plaintiff's proposed expert (Docket No. 125); and move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment (Docket No. 145). Plaintiff moves, pursuant to Rule 11 of the Federal Rules of Civil Procedure, for sanctions against Defendants based on their motion for summary judgment. (Docket No. 163). For the reasons stated below, all three motions are DENIED.

**BACKGROUND**

The following facts — derived from the Amended Complaint (Docket No. 37), Defendants' Answer (Docket No. 77), and the admissible material submitted by the parties with respect to the three motions — are viewed in the light most favorable to Plaintiff, the non-moving party.  *See, e.g.*, *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 157-58 (2d Cir. 2012).

**A.      The Murders, the Investigations, and the Prosecution**

On January 17, 1995, thirty-nine-year-old Denise Raymond was murdered inside of her apartment in the Bronx.  (Am. Compl. ¶ 14, 22; Decl. Shlomit Aroubas (Docket No. 147) ("Aroubas Decl."), Ex. B ("Apr. 1998 Decision") 1).  Two days later, on January 19, 1995, Baithe Diop, a livery cab driver, was shot and killed inside of his taxi.  (Am. Compl. ¶ 15; Apr. 1998 Decision 3).  Defendant Thomas Aiello, of the 43rd Precinct Detective Squad, was assigned as the lead detective on the Raymond homicide; it was his last investigation before retirement.  (Aroubas Decl., Ex. D ("Aiello Dep.") 31, 56-57, 61, 64; Aroubas Decl., Ex. E ("Donnelly Dep.") 23; *see* Decl. David A. Lebowitz (Docket No. 156) ("Lebowitz Decl."), Ex. 12).  Defendant Michael Donnelly, also of the 43rd Precinct Detective Squad, was assigned as the lead detective; it was his second homicide investigation.  (Donnelly Dep. 18, 22; *see* Lebowitz Decl., Ex. 12, at 46).  Although he could not "recall the exact conversation" or any of the "specifics," soon after he began investigating, Donnelly came to believe that the two crimes were linked.  (Donnelly Dep. 82, 93-96, 99).  A few weeks after the murders, Donnelly called Aiello and explained that he thought the homicides were related and that a witness — a sixteen-year-old named Cathy Gomez — had described to him "the people [who] were involved," "why . . . it happened," and facts "that were not reported to the public." (Aiello Dep. 94, 97, 99-100, 147-48; Dep. Non-Party Witness, Catherine Gomez ("Gomez Dep.")) 12-13; *see* Donnelly

Dep. 21, 82, 96).  After that call, Aiello and Donelly began working together; "the investigation started."  (Aiello Dep. 102; Donnelly Dep. 21-22; *see also* Lebowitz Decl., Ex. 12).

What Defendants did and did not do as part of their investigation are hotly contested.  In any event, on March 14, 1995, a grand jury in New York State Supreme Court, Bronx County, returned an indictment charging Plaintiff and six others — Eric Glisson, Michael Cosme, Cathy Watkins, Carlos Perez, Charles McKinnon, and Devon Ayers — with one or both murders.  (Aroubas Decl., Ex. AA).  The indictment was based in substantial part on the testimony of two civilian witnesses: Gomez and Miriam Tavares, a known drug addict.  (*See* Aroubas Decl., Ex. Z).  Gomez testified that she had overheard Plaintiff and his co-defendants planning the murders at Cosme's house and later bragging about both murders, confirming non-public details about the murder.  (*Id.* at NYC14218-28, NYC14235-36).  Tavares claimed that she had witnessed the Diop murder while standing on her toilet seat looking out a four-inch gap in the window — approximately three-hundred feet away from where Diop's taxi came to rest.  (*Id.* at NYC14148-52, NYC14154-55; *see also* Lebowitz Decl., Ex. 15 at V6923, V7130).  Among other things, she testified that she saw Glisson and Cosme steal a radio from the taxi, Perez make a slashing gesture across his neck; and someone who looked like Plaintiff from behind.  (Aroubas Decl., Ex. Z at NYC14150-51, NYC 14176; *see also* Lebowitz Decl., Ex. 15 at V7061-64, V7074-75, V7394, V7631).

Plaintiff and his co-defendants were tried in three separate jury trials.  In the first trial, which began in December 1996, Plaintiff, Ayers, Cosme, and Perez were tried for both homicides.  (Lebowitz Decl., Ex. 15 at V6100).  The prosecution's theory at trial was that Raymond's murder was a contract killing carried out at the behest of McKinnon, Raymond's former boyfriend who regularly supplied drugs for Plaintiff and the others to sell.  (Aiello Dep.

117; Lebowitz Decl., Ex. 15 at V6113).  The prosecution's theory with respect to the Diop

murder was that the defendants were carrying drugs "from one place to another, and then they

shot the cabdriver."  (Aiello Dep. 127; Lebowitz Decl., Ex. 15 at V6113).  Gomez and Tavares

both testified at the trial.  (Gomez Dep. 300-01, 305; Lebowitz Decl., Ex. 15 at V6419-59,

V7060-76).  On February 26, 1997, the jury acquitted Plaintiff of the Diop homicide, but found

him guilty of the Raymond murder.  The jury found Ayers, Cosme, and Perez guilty of both

murders.  (Lebowitz Decl., Ex. 15 at V9120-9129; Apr. 1998 Decision 1).  In the second trial,

Wakins and Glisson were tried and convicted of participating in the Diop murder.  (Pl.'s Mem.

Law Opp'n Defs.' Mot. Summ. J. (Docket No. 157) ("Pl.'s Summ. J. Mem.") 5).  On May 8,

1997, Plaintiff was sentenced to twenty-five years to life.  *See People v. Vasquez*, 841 N.Y.S.2d

261, 261 (App. Div. 1st Dept. 2007).  (Lebowitz Decl., Ex. 15 at V9154-55).  The other

convicted defendants were sentenced to similarly long terms of imprisonment.

In the third trial, of McKinnon alone, the tide began to turn against the prosecution.  (*See*

Lebowitz Decl., Ex. 16).  Kim Alexander, who had been Raymond's co-worker, had testified that

she recalled a man, possibly Jamaican, at their workplace on the day of the murder who was

waiting behind a column, "startled" her and Raymond, had an argument with Raymond, and then

took the elevator and left the building with them.  (Aiello Dep. 181-85).  During the

investigation, several detectives, including Aiello, reviewed security footage that would have

recorded what Alexander recalled, but did not identify Raymond or McKinnon on the tapes.  (*Id.*

at 186, 190-98).  Aiello told ADA McCarthy that the video had negative results with respect to

McKinnon; in turn, the prosecution did not turn over the tapes as potentially exculpatory

material.  (*Id.* at 192; Lebowitz Decl., Ex. 16 at V1765-66).  When the issue was raised at

McKinnon's trial, the Court directed McCarthy to contact Aiello "with respect to whether or not

he did or did . . . not have tapes at any point in time." (Lebowitz Decl., Ex. 16 at V1765, V1796). McCarthy, upon speaking with Aiello, found a videotape and turned it over. (*Id.* at V1796, V1816). The Court admonished the prosecution for a "serious" failure in not turning the tapes over "sooner." (*Id.* at V1817). The Court found that "the tape [w]as *Brady* material," its "disclosure [was] late," and the failure to disclose "possibly may have [a]ffected who [the defense] presented to the juries as . . . witnesses." (*Id.* at V1818). The Court offered McKinnon a mistrial, which he declined; the jury ultimately acquitted McKinnon. (*Id.* at V2153-54).

The cases against Plaintiff and the other defendants eventually unraveled too, albeit not until many years later. First, and most relevant to this case, on August 23, 2007, the Appellate Division, First Department unanimously reversed Plaintiff's conviction. *Vasquez*, 841 N.Y.S.2d at 261. The court wrote that "the only evidence offered by the People at trial even remotely linking [Plaintiff] to [the Raymond murder] was the testimony of an 18-year-old witness [Cathy Gomez] (she was 16 at the time of the crime)." *Id.* at 262. After examining her testimony, the court concluded that the prosecution's theory of the crime was "based on speculation unsupported by any credible evidence." *Id.* at 264. "[G]iven the insufficiency of the circumstantial evidence and the inconsistent and contradictory testimony of the witness at issue," the court reasoned, "even viewing such testimony and comments in the light most favorable to the People and despite the great deference to be accorded to a jury's credibility determinations, there is simply nothing that could lead a rational trier of fact to conclude that defendant was proven guilty beyond a reasonable doubt of this allegedly 'well-planned' contract murder." *Id.* Approximately four days later, Plaintiff was released from prison. (Am. Compl. ¶ 20). He had served more than twelve years of his sentence. (*Id.* ¶ 21).

In 2012, nearly five years after Plaintiff was released, an investigator in the United States Attorney's Office for the Southern District of New York, John O'Malley, received a letter from Glisson — who had been convicted of the Diop murder — describing the circumstances and asserting his innocence.  (Lebowitz Decl., Ex. 3 ("O'Malley Aff.") ¶ 7).  O'Malley "immediately recognized" Glisson's description of the murder as "matching" a robbery and shooting to which two gang members and former cooperating witnesses, Gilbert Vega and Jose Rodriguez, "had confessed" in 2003.  (*Id.*).  O'Malley then led an independent investigation into the murder.  O'Malley confirmed that the details of Vega and Rodriguez's confession matched the details of the Diop murder.  (*Id.* ¶ 16; Lebowitz Decl., Ex. 9 at V10418-19; Lebowitz Decl., Ex. 10 at V10436-37).  According to O'Malley, the investigation also established that Gomez and Tavares had lied to the grand jury and that Vega and Rodriguez acted alone in the Diop murder.  (O'Malley Aff. ¶¶ 16-17).  Plaintiff's co-defendants — that is, the other five defendants who had been convicted at the first two trials — were eventually released and their convictions vacated.  (Pl.'s Summ J. Mem. 6-7).

**B.    The Civil Litigation**

On August 20, 2010, Plaintiff filed this lawsuit.  (Compl. (Docket No. 1)).  Plaintiff's original co-defendants who had also been convicted, Cosme, Perez, Ayers, Watkins, and Eric Field (formerly Eric Glisson), as well as Field's daughter, Cynthia Morales, have since filed their own lawsuits, which were designated as related to this case.  *See Watkins v. City of New York*, 14-CV-887 (JMF); *Field v. City of New York*, 14-CV-1378 (JMF); *Cosme v. City of New York*, 14-CV-1653 (JMF); *Perez v. City of New York*, 14-CV-1654 (JMF); *Ayers v. City of New York*, 14-CV-1655 (JMF); *Morales v. City of New York*, 14-CV-2896 (JMF).  Plaintiff initially named as Defendants Donnelly, Aiello, Annabella Nieves, the NYPD, and the City of New York.

(Compl. ¶¶ 6-10; Am. Compl. ¶¶ 7-11).  On December 11, 2012, the Court dismissed all claims against the City of New York and the NYPD (and all claims against Aiello and Donnelly in their official capacities).  (Tr. Dec. 11, 2012 (Docket No. 73), at 13-16; Order of Dec. 12, 2012 (Docket No. 70)).[1]  Less than two weeks later, on December 22, 2012, Plaintiff was murdered, and his widow, Jessenia Vazquez (who apparently spells her last name differently), was substituted as plaintiff, in her capacity "as Administrator of the Estate of Israel Vasquez." (Docket Nos. 71-72, 76).  On August 23, 2013, the parties stipulated to dismissal of all claims against Nieves.  (Docket No. 121).  The claims remaining, brought against Donnelly and Aiello in their individual capacities pursuant to Section 1983, are for malicious prosecution (Am. Compl. ¶¶ 83-94); and denial of due process and a fair trial (*id.* ¶¶ 95-103).

Plaintiff's claims rely heavily on the fact that Gomez, the principal witness against him with respect to the Raymond murder, has recanted much if not all of her testimony.  Specifically, in deposition testimony taken last year (the admissibility of which is discussed below), Gomez testified that she met repeatedly with Defendants before she gave her testimony; that they coerced her into giving false testimony by threatening to jail her, arrest her family, and deport her parents; and that they fed her (and Tavares, with whom they met together) non-public details about the crimes to make her testimony seem more believable.  (*See, e.g.*, Gomez Dep. 135, 168-69, 232, 237, 273-74, 276-80, 305, 383-85; Lebowitz Decl., Ex. 5, at 977; Lebowitz Decl., Ex. 28, at 3:00-3:54, 12:19-12:40, 15:33-36).  Among other things, Gomez now claims that "most of" her testimony came from the police and that Donnelly showed her pictures and told her "how

---

[1]     In its ruling, the Court granted Plaintiff leave to replead his claims, brought under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against the City of New York.  (Tr. Dec. 11, 2012 (Docket No. 73), at 13-16; Order of Dec. 12, 2012 (Docket No. 70))).  Plaintiff never did.

[Raymond] got killed and all that." (Gomez Dep. 232, 274). In fact, Gomez stated in her deposition that she did not even know that the Raymond murder had occurred until Defendants told her about it. (*Id.* at 135-36).

Relying on the results of the O'Malley investigation and Gomez's deposition testimony, among other things, Plaintiff also impeaches the testimony of Tavares, who implicated him in the Diop murder (of which he was acquitted at trial). Tavares — a known drug addict who allegedly harbored a personal bias against Glisson and did not speak English (Lebowitz Decl., Ex. 5 at V975-76; Aroubas Decl., Ex. H at 146; Aroubas Decl., Ex. Z at NYC14152-53; Gomez Dep. 251; *see* Pl.'s Summ. J. Mem. 10) — gave an initial statement to the police on February 1, 1995 (the only time she met with the police with an official interpreter present), in which she said nothing about Plaintiff or about seeing anyone with a gun. (Lebowitz Decl., Ex. 26 at 120 (NYC12580)). After multiple meetings with Defendants and Gomez (who served as a translator for Tavares), during which Defendants allegedly fed both women information about the Diop murder, Tavares's testimony changed to implicate Plaintiff and to include many more details. (*Compare* Aroubas Decl., Ex. K at NYC4733-34, *with* Lebowitz Decl., Ex. 15 at V7061-62, 7074-75, V7130, V7394, V7631, *and* Lebowitz Decl., Ex. 26, at 120 (NYC12580), 141 (NYC5482)). According to Gomez, for example, when Tavares's narrative departed from the crime scene evidence, Donnelly told her that "[Diop] didn't [get] killed like that." (Gomez Dep. 234). After repeated meetings with Donnelly, Tavares also identified Watkins in a line-up, even though she had never seen her before. (*Id.* at 83, 164, 403-05; Lebowitz Decl., Ex. 17 at V2662; Lebowitz Decl., Ex. 21 at V11449). Plaintiff contends that the Diop homicide did not even take place within view of Tavares's window, from which she testified she had witnessed the incident.

(Aroubas Decl., Ex. Z at NYC14148-55; Lebowitz Decl., Ex. 1 ¶¶ 25-28; Lebowitz Decl., Ex. 2, at 241-43; Lebowitz Decl., Ex. 15 at V6923, V7130).

Finally, Plaintiff contends that testimony given by Alexander at his criminal trial was false and that Defendants suppressed evidence that would have shown as much.  As noted, the prosecution's theory at trial was that the Raymond murder was a contract killing carried out at the direction of McKinnon.  Central to that theory was Alexander's testimony that she had witnessed McKinnon harassing Raymond as she left her office on the evening that Raymond was murdered.  (Lebowitz Decl., Ex. 15 at V6488-6499).  According to Plaintiff, however, McKinnon was not even there that evening and Defendants knew it: Although Alexander testified that she, Raymond, and McKinnon entered an elevator together, a security videotape — retrieved and viewed by Aiello — showed that Alexander and Raymond actually left alone. (Lebowitz Decl., Ex. 4; Lebowitz Decl., Ex. 16 at V1821-22; Lebowitz Decl., Ex. 31; Lebowitz Decl., Ex. 32).  Rather than disclose that information, Aiello claimed falsely that the videotape showed nothing of value to the investigation (specifically, that it did not show the "victim or perp"); failed to voucher the videotape; and led the prosecutors to believe — and represent to the court at Plaintiff's trial — that the videotape contained no relevant information.  (Lebowitz Decl., Ex. 16 at V1765-66, V1821-22; Lebowitz Decl., Ex. 26, at 55 (NYC6939), 70 (NYC6941), 114 (NYC6965)).

**DISCUSSION**

As noted, Defendants move to preclude the report, opinions, and testimony of Plaintiff's proposed expert witness (Docket No. 125) and for summary judgment on all of Plaintiff's remaining claims — namely, for malicious prosecution and denial of due process and a fair trial (Docket No. 145).  Plaintiff moves for sanctions against Defendants and their counsel under Rule

11.  (Docket No. 163).  The Court will address Defendants' motion for summary judgment and Plaintiff's motion for sanctions, and then turn to Defendants' motion to preclude.

## A.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of Plaintiff's claims.  (Defs.' Mem. Law Supp. Mot. Summ. J. (Docket No. 148) ("Defs.' Summ. J. Mem.") 1).  Summary judgment is appropriate where the admissible evidence demonstrates "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute qualifies as genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In ruling on summary judgment motion, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  Relatedly, "a district court may not discredit a witness's deposition testimony . . . because the assessment of a

witness's credibility is a function reserved for the jury." *Moll v. Telesector Res. Grp., Inc.*, —
F.3d —, 2014 WL 3673357, at *7 (2d Cir. 2014) (internal quotation marks omitted).  Ultimately,
to defeat a summary judgment motion, the non-moving party must advance more than a "scintilla
of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt
as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586
(1986).  A party cannot "defeat the motion by relying on the allegations in [its] pleading or on
conclusory statements, or on mere assertions that affidavits supporting the motion are not
credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

## 1.  The Admissibility of Gomez's Deposition Testimony

In this case, Defendants' summary judgment motion is premised in no small part on a
contention that Gomez's April 8, 2013 deposition testimony should be disregarded as incredible.
(Defs.' Summ. J. Mem. 1-5).  Defendants acknowledge, as they must, the well-established
principle that credibility determinations are generally matters for the jury, not for the court on
summary judgment.  (*Id.* at 2).  Nevertheless, relying on *Jeffreys v. City of New York*, 426 F.3d
549 (2d Cir. 2005), they contend that Gomez's deposition testimony can be disregarded because
it "is so unreliable that . . . no rational jury could believe it."  (Defs.' Summ. J. Mem. 2).  In
*Jeffreys*, the Second Circuit recognized a narrow exception to the general rule that assessments
of credibility are the province of the jury, holding that summary judgment may be entered
against a plaintiff where there is "nothing in the record to support plaintiff's allegations other
than plaintiff's own contradictory and incomplete testimony," and the district court, "even after
drawing all inferences in the light most favorable to the plaintiff, determine[s] that no reasonable
person could believe [the plaintiff's] testimony."  *Jeffreys*, 426 F.3d at 555 (internal quotation
marks omitted).  Because the plaintiff's testimony in that case "was largely unsubstantiated by

any other direct evidence" and "was so replete with inconsistencies and improbabilities," the Court reasoned, "no reasonable juror would undertake the suspension of belief necessary to credit the allegations made in his complaint." *Id.*

Significantly, *Jeffreys* involved the testimony of a party. Whether the Second Circuit's holding extends to the testimony of a third-party witness such as Gomez is unclear. *Compare, e.g.*, *Blake v. Race*, 487 F. Supp. 2d 187, 203 (E.D.N.Y. 2007) (stating that "[d]efendants have failed to cite any case where a court has extended the holding of *Jeffreys* to disregard the testimony of a non-party witness in a summary judgment motion on credibility grounds," but noting that it was "willing to assume that *Jeffreys* could be extended to exceptional circumstances where a witness' testimony is so fanciful and lacking in any corroboration that it could be insufficient to create an issue of fact because no rational jury could believe it"), *with Bouche v. City of Mt. Vernon*, No. 11-CV-5246 (SAS), 2013 WL 322613, at *6 n.79 (S.D.N.Y. 2013) ("[T]he holding in *Jeffreys* can be extended to a witness' testimony if it is so unreliable that it cannot create an issue of fact because no rational jury could believe it."). In *In re Fosamax Products Liability Litigation*, 707 F.3d 189, 194 (2d Cir. 2013) (per curiam), the Second Circuit upheld the exclusion of an expert's testimony because it contained "unequivocal and inescapable" contradictions that placed the case within the scope of *Jeffreys*. But the Court cautioned that, "[i]n the ordinary case where a district court is asked to consider the contradictory deposition testimony of a *fact* witness . . . the general rule remains that a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." *Fosamax*, 707 F.3d at 194 n.4 (2d Cir. 2013) (emphasis added) (internal quotation marks omitted).

In this case, the Court need not resolve whether the *Jeffreys* exception applies to a non-party fact witness, because even if it does, the exception would not apply to Gomez's deposition testimony.  Put simply, drawing all inferences in Plaintiff's favor, the Court cannot say that "*no reasonable person*" could find Gomez's testimony credible.  *Jeffreys*, 426 F.3d at 555 (emphasis added).  Among other things, Plaintiff advances "plausible explanation[s] for [the] discrepancies" that Defendants highlight in Gomez's testimony.  *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998).  As Plaintiff argues, for example, much of the cited testimony could "reflect[] a nervous, learning-disabled individual attempting — in the face of openly hostile and intentionally confusing questioning — to communicate to the best of her ability the basic fact that she was intimidated into providing false testimony."  (Pl.'s Summ. J. Mem. 23 (citing Gomez Dep. 186); *see also id.* at 8-10 (discussing Gomez's testimony)).  Additionally, here, unlike in *Jeffreys*, there is independent evidence in the record — most notably, the O'Malley investigation — that corroborates Gomez's testimony.  (O'Malley Aff. ¶¶ 16-17).[2]  Thus, the facts in this case are far from the "extreme" facts present in *Jeffreys*, and this case is not among those "extraordinary cases, where the facts alleged are so

---

[2]    Defendants suggest that evidence relating to the Diop murder — including the O'Malley investigation — is irrelevant to Plaintiff's claims because his claims are limited to his prosecution for the Raymond murder.  (Defs.' Summ. J. Mem. 1 n.2, 16 n.16, 25 n.26).  (Any claims relating to the Diop murder, of which Plaintiff was acquitted, were long ago time barred.)  Putting aside whether any particular item of evidence is inadmissible (a question the Court can address at trial or through motions *in limine*), that suggestion is without merit as the investigations of the two murders and the resulting prosecution were inextricably intertwined.  Moreover, as Defendants themselves concede (*id.* at 25 n.27), evidence relating to the Diop investigation is highly relevant to an assessment of the credibility of witnesses such as Gomez, which is central to this case.  Finally, the law is clear that a plaintiff may rely on prior acts as background evidence in support of a timely claim.  *See, e.g.*, *Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d 463, 483 (S.D.N.Y. 2009) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Glynn v. Cnty. of Suffolk*, 50 F. App'x 58, 58-59 (2d Cir. 2002)).

contradictory that doubt is cast upon their plausibility." *Matheson v. Kitchen*, 515 F. App'x 21, 23-24 (2d Cir. 2013) (internal quotation marks omitted). Gomez's testimony may well be "subject to serious question," but "it is not so blatantly false that the Court may simply reject it as a matter of law." *Moore v. Casselberry*, 584 F. Supp. 2d 580, 587 (W.D.N.Y. 2008).[3]

### 2. Defendants' Other Arguments for Summary Judgment

Having concluded that Gomez's 2013 deposition testimony cannot be disregarded, the Court can swiftly address most of Defendants' arguments for summary judgment. Specifically, Defendants argue that Plaintiff's malicious prosecution claim should be dismissed because he cannot establish (1) that they initiated the criminal proceedings (in light of the prosecutor's exercise of charging discretion), (2) that they lacked probable cause (especially in light of the presumption created by the grand jury's indictment), or (3) that they acted with malice (Defs.' Summ. J. Mem. 30-34); and that Plaintiff's denial of due process and fair trial claims should be dismissed because they "fail on the merits" (*id.* at 37). Defendants also contend that they are entitled to qualified immunity. (*Id.* at 37-40). In light of Gomez's 2013 deposition testimony alone, however, there are plainly disputes of fact that preclude summary judgment on any of those grounds. Drawing all inferences in Plaintiff's favor, a jury could infer from Gomez's testimony that Defendants fabricated all (or most of) her testimony. If the jury did so, Plaintiff could establish the relevant elements of his claims. *See, e.g.*, *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) (holding that a plaintiff can rebut the presumption of probable cause

---

[3]       For similar reasons, Defendants' reliance on the "sham issue of fact" doctrine is misplaced. (Defs.' Summ. J. Mem. 4-5). *See, e.g.*, *Moll*, 2014 WL 3673357, at *6 (holding that the district court had erred in disregarding a witness's testimony based on the doctrine where there was "a readily apparent, plausible explanation for any inconsistency in his testimony"). Moreover, the Second Circuit recently made clear that, under the "sham issue of fact" doctrine, a district court is not required to disregard contradictory testimony from a third-party witness who is not controlled by a party. *See id.*

created by a grand jury indictment with "evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith" (internal quotation marks omitted)); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130-31 (2d Cir. 1997) (holding that a plaintiff can satisfy the initiation and malice elements of a malicious prosecution claim by showing that a law enforcement officer manufactured false evidence and forwarded it to prosecutors). Additionally, Defendants would not be entitled to qualified immunity, as no reasonable officer would have believed that manufacturing false testimony was lawful. *See, e.g.*, *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994).

A few of Defendants' arguments for summary judgment, however, warrant further brief discussion. First, Defendants contend that Plaintiff cannot show that they were both personally involved in each alleged constitutional violation — specifically, that Aiello was personally involved in fabricating evidence and the other alleged violations that give rise to the malicious prosecution claim and that Donnelly was personally involved in the alleged *Brady* violation. (Defs.' Summ. J. Mem. 8 n.10, 11 n.12, 16 n.15, 18 n.20; *see also* Defs.' Mem. Law Opp'n Pl.'s Rule 11 Mot. Sanctions (Docket No. 176) 4-5). As an initial matter, to the extent that those arguments are relegated to footnotes, they are not properly presented and need not be considered. *See, e.g.*, *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) (citing cases). Even if they were properly raised, however, the arguments provide no basis for summary judgment. Defendants were the lead detectives in the two homicides and closely collaborated throughout the investigations. (Aiello Dep. 102; Donnelly Dep. 21-22; *see also* Lebowitz Decl., Ex. 12). In fact, because of how closely the two worked together, the prosecution at Plaintiff's criminal trial even stipulated that the defense could "pose any questions to Donnelly which they could pose to Aiello." (Lebowitz Decl., Ex. 15 at V7817). Further, there is evidence in the

record that Defendants met with witnesses (including, most notably, Gomez) together; that

Aiello was present when witnesses were coached to testify falsely; and that multiple detectives

viewed the videotape showing Raymond and Alexander together.  (*See, e.g.*, Gomez Dep. 233-

40, 382-87; Lebowitz Decl., Ex. 16 at V1798).  In light of this evidence, a reasonable jury could

find that each Defendant was personally involved in the relevant activities of the other and thus

find them both liable for each constitutional violation.  *See, e.g.*, *Fischl v. Armitage*, 128 F.3d 50,

57 (2d Cir. 1997) (holding that a reasonable juror could infer from an officer's presence during a

constitutional violation that he "knowingly did nothing to stop it," satisfying the requirement of

personal involvement).

Second, Defendants contend that, even if true, many of Plaintiff's allegations —

including, for example, that they interviewed witnesses together, that they used one witness to

translate for another, that they paid witnesses cash for transportation and the like, and that they

failed to follow up on leads — fail to establish constitutional violations.  (Defs.' Summ J. Mem.

11-12, 16).  In doing so, however, Defendants ask the Court to analyze myopically each

allegation in isolation rather than viewing them cumulatively.  Moreover, although the evidence

at issue may not establish a freestanding constitutional violation — as Plaintiff himself

acknowledges (Pl.'s Summ. J. Mem. 28) — it is nevertheless relevant to whether Defendants

acted with malice, which Plaintiff must prove to establish malicious prosecution.  *Cf., e.g.*, *Russo

v. City of Bridgeport*, 479 F.3d 196, 210 (2d Cir. 2007) (noting that deviation from accepted

police procedures can give rise to an inference of deliberate indifference or improper motive).

The evidence is also relevant to Plaintiff's effort to rebut the presumption of probable cause that

applies by virtue of the grand jury's indictment, as one way Plaintiff may do so is by showing

"that the conduct of the police deviated so egregiously from acceptable police activity as to

demonstrate an intentional or reckless disregard for proper procedures." *Williams v. City of N.Y.*, No. 02-CV-3693 (CBM), 2003 WL 22434151, at *6 (S.D.N.Y. Oct. 23, 2003) (quoting *Richards v. City of N.Y.*, 97-CV-7990 (MBM), 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003)) (internal quotation marks omitted).

Third, Defendants argue that, to the extent Plaintiff's due process and fair trial claims are premised on a *Brady* violation, they are time barred and, more generally, that his fair trial claim should be dismissed as duplicative of his malicious prosecution claim. (Defs.' Summ J. Mem. 34-37). The Court, however, rejected precisely those arguments in denying Defendants' motion to dismiss, holding that Plaintiff's *Brady* claim "did not accrue until August 23rd, 2007, when his conviction was reversed by the Appellate Division and he could bring suit" (Dec. 12, 2013 Tr. at 8 (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)); and that Defendants' arguments about merger flew "in the face of more than a decade of Second Circuit precedent still being followed by virtually every court in this district." (*Id.* at 7 (citing cases)). Defendants cite no evidence that was (or even could have been) revealed during discovery that would justify revisiting those rulings. *See, e.g.*, *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) (holding that where discovery reveals new evidence, a court has discretion "to revisit a conclusion based on factual allegations taken as true at the motion to dismiss stage, and determine, based on undisputed evidence at the summary judgment stage, that no reasonable jury could find" liability). Nor do they identify any "intervening change of controlling law" or "need to correct a clear error or prevent manifest injustice," which could conceivably call for deviating

from the law of the case.  *United States v. Yonkers Bd. of Educ.*, 856 F.2d 7, 11 (2d Cir. 1988) (internal quotation marks omitted).[4]

In the final analysis, Defendants could prevail on their motion only if the Court were to draw various inferences in their favor.  Indeed, as Plaintiff rightly notes (Pl.'s Summ. J. Mem. 16-17; Pl.'s Mem. Law Supp. Mot. Sanctions (Docket No. 165) ("Pl.'s Sanctions Mem.") 3; Pl.'s Reply Mem. Law Supp. Mot. Sanctions (Docket No. 178) 1-2), Defendants' motion papers are littered with phrases such as "could have," "equally possible," and "stands to reason" (Defs.' Summ. J. Mem. 10, 13, 16, 23; Defs.' Reply Mem. Law Supp. Mot. Summ. J. (Docket No. 174) 16, 17) — phrases that generally find no place at the summary judgment stage.  Defendants' arguments may well have force, but that is for a jury to decide at trial, not for the Court to decide on summary judgment.  *See, e.g.*, *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (reiterating that, on summary judgment, a district court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence . . . . 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)) (emphasis omitted)).

---

[4]     Similarly, at the motion to dismiss stage, the Court rejected several arguments Defendants made with respect to Plaintiff's *Brady* claim, concluding that the Amended Complaint "plausibly allege[d] that the videotape at issue was material because it would have raised a strong doubt about the prosecution's theory of the murder" and that, "contrary to defendant[s'] contention, plaintiff was not on notice of the tape or not necessarily on notice of the tape because, as alleged in the complaint, Aiello falsely reported that the victim did not appear on the tape."  (Dec. 12, 2013 Tr. at 12).  To the extent that Defendants press those arguments again in their motion for summary judgment (Defs.' Summ. J. Mem. 18-25), they are without merit as there is evidence in the record to support the relevant allegations in the Amended Complaint.  *See supra* Subsection A.2.

**B.      Plaintiff's Motion for Sanctions**

Before turning to Defendants' motion to exclude Plaintiff's expert, the Court will briefly

address Plaintiff's contention that sanctions should be imposed on Defendants and their counsel

for their summary judgment motion.  (Docket No. 163; *see also* Pl.'s Sanctions Mem. 1).  Rule

11(b) of the Federal Rules of Civil Procedure provides, in relevant part, that a "written motion"

must "not be[] presented for any improper purpose" and must be "warranted by existing law or

by a nonfrivolous argument for extending, modifying, or reversing existing law."  Fed. R. Civ. P.

11(b)(1)-(2); *see also, e.g.*, *Caisse Nationale de Credit Agricole-CNCA, New York Branch v.

Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir. 1994).  A legal position is frivolous if, under an

"objective standard of reasonable[ness]," *Burger v. Health Ins. Plan of Greater N.Y.* , 684 F.

Supp. 46, 54 (S.D.N.Y. 1988) (internal quotation marks omitted), a court finds that it is

"clear . . . that there is *no* chance of success and *no* reasonable argument to extend, modify, or

reverse the law as it stands," *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990) (emphasis

added).  It must be "*patently clear* that a claim has *absolutely no* chance of success."  *Healey v.

Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (emphasis added) (internal quotation marks

omitted).  Rule 11(b) also provides that factual contentions in a motion must "have evidentiary

support" and any "denials of factual contentions" must be "warranted on the evidence or . . .

reasonably based on belief or lack of information."  Fed. R. Civ. P. 11(b)(3)-(4).

Applying those standards here, and mindful that sanctions decisions must be made "with

restraint and discretion," *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 334 (2d

Cir. 1999), "lest they chill the creativity essential to the evolution of the law," *Greenberg v.

Chrust*, 297 F. Supp. 2d 699, 703 (S.D.N.Y. 2004), the Court declines to impose sanctions.

Plaintiff is correct that, in certain respects, Defendants' motion papers disregard the standards

applicable to summary judgment and that Defendants resurrect some arguments that the Court

previously rejected without articulating any substantial basis for doing so.  Nevertheless, the

Court cannot say that it was, or should have been, "patently clear" that Defendants had

"absolutely no chance of success."  *Healey*, 947 F.2d at 626.  Among other things, Defendants

made a good faith argument for extension of the *Jeffreys* exception to third-party witnesses (an

argument that some courts in this Circuit have actually accepted).  Had the Court accepted that

argument and found it applicable to Gomez's testimony, it is "not *completely* inconceivable" that

the Court could have found in Defendants' favor on one or more of the dependent arguments.

*Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (emphasis added).  In short, although

ultimately unsuccessful, the motion was "not so quixotic as to warrant sanctions."  *Rodick v. City

of Schenectady*, 1 F.3d 1341, 1351 (2d Cir. 1993).

**C.    Defendants' Motion To Preclude Plaintiff's Proposed Expert's Testimony**

Finally, Defendants move to preclude the report, opinions, and testimony of Walter

Signorelli, Plaintiff's proposed expert on police practices and standards.  In particular, they move

to preclude Signorelli's report, opinions, and testimony on the grounds that (1) he is unqualified;

(2) his methodology is not reliable; (3) he impermissibly assists the trier of fact; and (4) his

testimony is irrelevant.  (Defs.' Mem. Law Supp. *Daubert* Mot. To Exclude (Docket No. 127)

("Defs.' *Daubert* Mem.") 5).  To the extent that Defendants move to strike Signorelli's report

itself (Decl. of Curt P. Beck (Docket No. 126) ("Beck Decl."), Ex. A ("Signorelli Report")), the

motion is effectively moot as the Court did not rely on the report in reaching its conclusions on

the motion for summary judgment.  But, insofar as the case will now proceed to trial (absent

settlement), the portion of the motion seeking to preclude Signorelli from testifying is not moot.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides, in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his opinion if:

> (a) the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the United States Supreme Court defined the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — [ ] assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  The Rule 702 inquiry is a "flexible" one that "depends upon the particular circumstances of the particular case at issue."  *Floyd v. City of New York*, 861 F. Supp. 2d 274, 286 (S.D.N.Y. 2012) (internal quotation marks omitted).  Although a district court should "admit expert testimony only where it is offered by a qualified expert and is relevant and reliable," *Cohalan v. Genie Indus., Inc.*, No. 10-CV-2415 (JMF), 2013 WL 829150, at *3 (S.D.N.Y. Mar. 1, 2013), exclusion remains "the exception rather than the rule," *Floyd*, 861 F. Supp. 2d at 287 (internal quotation marks omitted).

Applying those standards here, there is no basis to preclude Plaintiff's expert from testifying.  Defendants' first two objections — to Signorelli's qualifications and the reliability of his methods and data — ultimately go to the weight of his testimony rather than to its admissibility.  *See, e.g.*, *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as

a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.").  Signorelli may not have been a homicide detective *per se* (*see* Defs.' *Daubert* Mem. 6), but his thirty-one years of experience with the NYPD, his supervision of detectives responding to crime scenes and conducting investigations, his training with respect to such matters, his academic study of police practices, and his prior qualification as an expert in almost eighty cases (*see* Pl.'s Mem. Law Opp'n Defs.' *Daubert* Mot. (Docket No. 131) 9-11 & n.10 (discussing Signorelli's credentials)), are more than enough to qualify him as an expert in police standards and practices with respect to investigations.  Similarly, although Signorelli's opinions may not rest on statistical studies or traditional scientific methods (*see* Defs.' *Daubert* Mem. 8-16), they are, nevertheless, based on data — including personal experience, interviews, review of police manuals and other primary sources, and review of academic literature — "of a type reasonably relied upon by experts in various disciplines of social science."  *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001) (Lynch, J.); *accord Cerbelli v. City of N.Y.*, No. 99-CV-6846 (RML), 2006 WL 2792755, at *8 (E.D.N.Y. Sept. 27, 2006); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999) (acknowledging that, in some fields, the reliability inquiry may turn on personal knowledge and experience rather scientific method). Signorelli's weaknesses on these fronts are fair ground for cross-examination, but they are not a basis for preclusion.  *See, e.g.*, *Cerbelli*, 2006 WL 2792755, at *6; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Defendants' third objection — that Signorelli's testimony impermissibly assists the trier of fact in various ways (Defs.' *Daubert* Mem. 18-24) — is also not a basis to preclude Plaintiff's

expert altogether.  A few stray sentences in his report perhaps aside, Signorelli does not opine on

the credibility of other witnesses or offer views on "ultimate legal conclusions."  (Defs.' *Daubert*

Mem. 23).  And to the extent that Signorelli does improperly touch on such subjects, the Court

can address those defects at trial by ruling on objections to particular questions and testimony.

*Cf. Fate v. Village of Spring Valley*, No. 11-CV-6838 (JPO), 2013 WL 2649548, at *6 (S.D.N.Y.

June 13, 2013) (holding that while an expert could testify regarding police practices and the

defendants' compliance therewith, he could not "offer testimony about what he believes actually

happened or about the credibility of any witness," could "not offer legal testimony," and could

not offer opinions with respect to the defendants' compliance with constitutional standards).

Additionally, contrary to Defendants' assertions, Signorelli does not "simply [rely] on 'common

sense' arguments in reaching his conclusions."  (Defs.' *Daubert* Mem. 23).  Police training,

policies, and procedures — the subjects of Signorelli's testimony — are "[c]learly . . . complex

areas outside common experience."  *Cerbelli*, 2006 WL 2792755, at *8.  And, in any event, "it is

settled in this Circuit that expert testimony is helpful even where the jury might have general

knowledge of the subject at issue, so long as such knowledge may be incomplete or inaccurate

given the particular facts and circumstances relevant to the particular case for which expert

testimony is offered."  *Katt*, 151 F. Supp. 2d at 358.

Finally, Defendants' relevance objections fall short.  (Defs.' *Daubert* Mem. 25-26; Defs.'

Reply Mem. Supp. *Daubert* Mot. To Exclude (Docket No. 141) ("Defs.' *Daubert* Reply Mem.")

2-5).  Courts in and out of this Circuit routinely admit testimony on police practices in civil

rights cases of this sort.  *See, e.g.*, *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907-09

(6th Cir. 2004); *Dickerson v. McClellan*, 101 F.3d 1151, 1163-64 (6th Cir. 1996); *Kladis v.*

*Brezek*, 823 F.2d 1014, 1019 (7th Cir. 1987); *Fate*, 2013 WL 2649548, at *5; *Bussey-Morice v.*

*Kennedy*, No. 11-CV-970 (GJK), 2012 WL 7992419, at *3-4 (M.D. Fla. Dec. 28, 2012);

*Cerbelli*, 2006 WL 2792755, at *8; *Valentin v. New York City*, 94-CV-3911 (CLP), 1997 WL

33323099, at *25 (E.D.N.Y. Sept. 9, 1997).[5]  More specific to this case, as discussed above, in

order to prevail on his malicious prosecution claim, Plaintiff must both prove that Defendants

acted with malice and rebut the presumption of probable cause that arises from the grand jury's

indictment, perhaps by showing "that the conduct of the police deviated so egregiously from

acceptable police activity as to demonstrate an intentional or reckless disregard for proper

procedures."  *Williams*, 2003 WL 22434151, at *6 (internal quotation marks omitted).

Signorelli's testimony concerning police standards and Defendants' alleged deviations from

those standards — by, for example, conducting joint witness interviews, providing non-public

facts to witnesses, failing to follow leads, relying on prejudicial identifications, and mishandling

evidence (Signorelli Report ¶¶ 25-49; *see, e.g.*, Beck Decl., Ex. B at 117, 184-85) — speaks

directly to those issues and thus plainly qualifies as relevant under Rule 401 of the Federal Rules

of Evidence.  *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir.

2002) (noting that "expert testimony is relevant" if it "ha[s] any tendency to make the existence

of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence" (internal quotation marks omitted)).[6]

---

[5]      Defendants concede that "in those civil rights cases in which state law claims were
present, or where a policy and practice claim under *Monell* [*v. Dep't of Social Servs.*, 436 U.S.
658 (1978)] claim [sic] is asserted, a party could make an argument that a police practices expert
might be able to offer relevant testimony."  (Defs.' *Daubert* Reply Mem. 5-6).  Putting aside the
fact that that concession undermines the force of some of Defendants' arguments, Defendants
cite no authority for the proposition that expert testimony concerning police practices is strictly
limited to such cases.  Moreover, such a proposition would be inconsistent with some or all of
the cases cited in the text.

[6]      Defendants are on firmer ground when they argue that the violation of police policies and
standards, whether followed by the NYPD or not, does not in itself establish a constitutional

Accordingly, Defendants' motion to exclude Signorelli's report is DENIED.

## CONCLUSION

For the reasons stated above, all three pending motions are DENIED.

The parties shall immediately contact the Chambers of Magistrate Judge Maas (to whom the case was previously referred for settlement purposes (Docket No. 188)) in the event that they are interested in having another settlement conference (either jointly with the related cases cited above or individually). Regardless, within **thirty days** of this Opinion and Order, the parties shall submit to the Court for its approval a Joint Pretrial Order prepared in accordance with Federal Rule of Civil Procedure 26(a)(3) and the Court's Individual Rules and Practices. The parties should follow Paragraph 5 of the Court's Individual Rules and Practices, which identifies submissions that must be made at or before the time of the Joint Pretrial Order, including any motions *in limine*. At or before the same date, the parties shall also file joint requests to charge, joint proposed verdict forms, and joint proposed voir dire questions in accordance with the Court's Individual Rules and Practices. Jury instructions may not be submitted after the Joint Pretrial Order due date, unless they meet the standard of Federal Rule of Civil Procedure

---

violation. (Defs.' *Daubert* Mem. 25-26; Defs.' *Daubert* Reply Mem. 2-5). *See, e.g.*, *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (noting that Section 1983 "protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices" (internal quotation marks omitted)); *see also, e.g.*, *Cerbelli v. City of N.Y.*, No. 99-CV-6846 (ARR), 2008 WL 4449634, at *10 (E.D.N.Y. Oct. 1, 2008) ("[L]ocal agency-established policies . . . do not establish constitutional standards."). But that does not necessarily justify excluding Signorelli's testimony altogether. (For example, in *Thompson*, upon which Defendants heavily rely (Defs.' *Daubert* Reply Mem. 3-5), the Court excluded the Chicago Police Department's actual policies from evidence, but permitted expert testimony concerning police standards and the defendants' compliance with them. *See, e.g.*, *Thompson*, 472 F.3d at 451-52, 455-56.) Moreover, the relationship, and distinction, between constitutional standards and police policies and standards can be addressed through appropriate jury instructions at trial. The parties should confer on the timing and substance of appropriate jury instructions on that score.

51(a)(2)(A).  The parties shall be ready for trial approximately two weeks after the Joint Pretrial

Order is filed.

The Clerk of Court is directed to terminate Docket Numbers 125, 145, and 163.

SO ORDERED.

Dated: September 5, 2014
       New York, New York

JESSE M. FURMAN
United States District Judge